# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT CAMPBELL,** | ) | **CASE NO.  5:04 CV 2505** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **THE UNIVERSITY OF AKRON,** | ) | **AND ORDER** |
| | ) | |
| **Defendant.** | ) | |

This matter is before the Court upon Defendant The University of Akron's Motion for Summary Judgment (Dkt. #17).

## I.  FACTUAL HISTORY

Defendant, The University of Akron (the "University"), employs Plaintiff, Robert Campbell ("Campbell"), as a Certified Master HVAC Technician in the University's Physical Facilities Operation Center ("PFOC").  (Dkt. #18, Deposition of Robert M. Campbell, Jr. ("Campbell Dep.") at 4–5.  At this time Campbell is the only African-American in the HVAC shop and is one of two Certified Master HVAC Technicians. (Dkt. #23, Deposition of Joseph Gregor ("Gregor Dep.") at 21; Campbell Dep. at 9).  As an HVAC Technician, Campbell is responsible for the repair and maintenance of the heating, ventilation, and air conditioning systems at various buildings on the University's campus.

(Dkt. #17 at 1).  Campbell has worked as an HVAC Technician for approximately ten years. (Id.).

On July 17, 2002, Campbell settled Case No. 5:00 CV 2506, a Federal Employment Discrimination lawsuit ("Settlement").   (Campbell Dep. at 16–17).   As part of the Settlement, Campbell released any and all claims he had as to the University including claims of discrimination, harassment, and retaliation for any events occurring on or before August 28, 2002.  (Id. at 16).  Since the Settlement, however, Campbell claims he has suffered retaliation and continued to suffer racial discrimination and harassment in the form of unwarranted discipline and denied promotions.  (Campbell Dep. at 18).

### "Insubordination" Incident

Among the discipline received by Campbell is a verbal warning in August 2003 for insubordinate conduct and refusal to take direction from or cooperate with his supervisor, Robert Kraus ("Kraus").  (Campbell Dep. at 60; Dkt. #17, Ex. A, Affidavit of Robert Kraus ("Kraus Aff.") ¶¶ 3–7; Dkt. #17, Ex. A-1).  In 2004, a white employee was also given a verbal warning for engaging in the same sort of conduct to his supervisor.  (Dkt. #17, Ex. B, Affidavit of Sandra Smith ("Smith Aff.") ¶ 7).

### Lunch Break Incidents

Beginning in 2003 Campbell received discipline for a series of incidents related to lunch breaks.  Campbell received a verbal warning in the Fall of 2003 for exceeding his lunch break. (Campbell Dep. at 75).   During his lunch break, Campbell and James Carstarphen ("Carstarphen"), an African-American and PFOC employee in the Electric

Shop, had been working out in the weight room at the Ocasek Natatorium ("Natatorium"). (Id. at 72–73).  Campbell arrived from the Natatorium late and failed to call or receive permission for a late break as required.  (Campbell Dep. at 74–75).

In November 2004 Campbell received a second, written warning.  (Campbell Dep. at 75).  This incident occurred in the University's Police Department weight room.  (Id.). With Campbell, exercising in the weight room, were Carstarphen, Tim Howard ("Howard"), a white PFOC employee, and James Stewart ("Stewart"), who at that time was not a PFOC employee.  (Id. at 76).  The PFOC disciplined Campbell, Carstarphen and Howard.  (Id. at 76).  Campbell and Carstarphen each received written warnings and Howard, who had not been disciplined before this incident, received a verbal warning.  (Id. at 77).  Campbell grieved the written warning and it was determined during the grievance procedure that the write-up would be withdrawn, but the next infraction by Campbell would result in a suspension.  (Campbell Dep. at 77, 78).

Sandra Smith ("Smith"), the Associate Director of Administration for the PFOC, whose responsibility it is to track disciplinary actions of PFOC employees attests that Campbell received this discipline.  (Smith Aff. ¶¶ 1–2).  Smith also attests that other white PFOC employees received discipline for abusing lunch breaks during 2000 to 2003.  (Id. ¶ 5).  On the other hand, several white PFOC employees admit to abusing lunch breaks without receiving discipline.  Campbell's supervisor, Kraus, admitted to abusing lunch breaks when he was a technician and reasoned he never received discipline because he was never caught.  (Dkt. #23, Deposition of Robert J. Kraus ("Kraus Dep.") at 58).  Campbell's

3

co-workers, Stewart and Carl Myers ("Myers") attest they regularly exceed lunch breaks without receiving discipline. (Dkt. #22, Ex. 4, Affidavit of Carl Myers ("Myers Aff."); Dkt. #22, Ex. 5, Affidavit of James Stewart ("Stewart Aff.")).

### Falsifying Records Incident

In February 2005 there was another incident. (Campbell Dep. at 83). Campbell was working out at the Natatorium. (Id. at 83). According to the University's time-keeping and videotape surveillance, Campbell arrived at the Natatorium between 11:30 and 11:37. (Id. at 83–84). Campbell filled out a time card that day stating he was on a call at Zook Hall from 11:00 to 1:00, for which he would have received overtime. (Campbell Dep. at 84, 86). Thus, the University records revealed Campbell to be on a break when his time card indicated he should be working. (Id. at 84). Campbell disputes the length of time he was at the Natatorium and alleges that the video tape surveillance is inaccurate. (Id. at 85). Campbell received, and a third step grievance procedure upheld, a 10 day suspension for falsifying records. (Dkt. #17, Ex. C, Affidaivt of William Viau ("Viau Aff.") ¶¶ 10–12). Administrator Smith attests that the PFOC has suspended and recommended for termination white employees who have falsified records. (Smith Aff. ¶ 16).

### Lock-out/Tag-out Incident

In December 2004, Campbell received a verbal warning for violation of the University's lock-out/tag-out safety rule. (Campbell Dep. at 63; Kraus Aff; Dkt. #17, Ex. A-2). The PFOC issues to its employees a lock-out/tag-out lock to be used solely for locking out stored energy or a breaker if an employee is working on a piece of equipment.

4

(Campbell Dep. at 67).  On December 1, 2004, the PFOC instituted a new lock-out/tag-out policy as part of a stricter safety procedure that would better indicate equipment which posed a health or safety hazard.  (Gregor Dep. at 35–40; Kraus Aff.; Campbell Dep. at 67).  Campbell, after institution of this new policy, improperly used the lock-out/tag-out lock to secure a ladder and received, as discipline, a verbal warning. (Campbell Dep. at 67–68).

Negotiations between the PFOC administration and Campbell's union resulted in an agreement that the verbal warning would be removed from Campbell's file if he would retake the lock-out/tag-out training.  (Id. at 68).  In early 2005, Campbell re-took the training with pay, passed the examination, and the verbal warning was removed from his file.  (Id. at 68, 71).  Also in 2004, the PFOC gave a verbal warning to a white employee for violation of the University's lock-out/tag-out rules.  (Smith Aff. at ¶ 9).

### Non-Promotion

In August 2002,  Director of the PFOC, Joe Gregor ("Gregor"), appointed Kraus as Superintendent of the HVAC Shop.  (Campbell Dep. at 19; Gregor Dep. at 14–20).  Gregor did not post the position for Superintendent of the HVAC Shop.  (Gregor Dep. at 20; Campbell Dep. at 19). Instead, he asked Kraus, already a Superintendent, to temporarily assume the position.  (Gregor Dep. at 17).  Gregor at no point considered Campbell for the Superintendent of the HVAC Shop position, because he did not consider Campbell as qualified as Kraus or even Rob Fraley, who were two of the newest Superintendents Gregor

5

had just hired.[1]  (Id. at 18).  Kraus ultimately retained the Superintendent for the HVAC Shop position, which, for him, rather than a promotion, represented a lateral move.  (Gregor Dep. at 20).

On three separate occasions, beginning in May 2004, Campbell interviewed for promotions to a supervisor position.  Two of those interviews were for positions in the PFOC and one was with the Department of Student Recreation and Wellness Services ("Student Services").  (Campbell Dep. at 114).  In May 2004, Campbell interviewed with Student Services for the position of Manager of Maintenance.  (Dkt. #17, Ex. D, Affidavit of Charles Knusman ("Knusman Aff."); Campbell. Dep. at 116).  Campbell did not receive the position.  (Knusman Aff.).  Instead, Student Services hired Richard Grizer, a white male.  (Id.).  The selection committee deemed Campbell unqualified for the position because he was not a Certified Pool Operator and had failed the requisite certification course.  (Id.).

In December 2004, Campbell interviewed for the position of Zone Superintendent in the PFOC.  (Dkt. #17, Ex. B-1).  The selection committee determined that Campbell was the sixth most qualified applicant and chose James Miller, a white male, as the most qualified applicant.  (Dkt. #17, Ex. B-1).  In April 2005 Campbell again interviewed for the position of Zone Superintendent in the PFOC.  (Dkt. #17, Ex. B-2).  The selection committee determined that Campbell was the third most qualified applicant, but chose John

---

[1]The PFOC employs several Superintendents in various divisions, HVAC being one of them.  (Kraus Dep. at 4).

Gromofsky, a white male, as the most qualified applicant.  (Dkt. #17, Ex. B-2).

Nevertheless, the position, as of May 6, 2005 remains open. (Campbell Dep. at 119).  The

University even contacted Campbell, asking him to interview again for the position.  (Id.).

Based upon the above incidents, Campbell filed the instant action on December 21,

2004 under both Title VII and 42 USC § 1981 claiming discrimination on the basis of race,

racial harassment and retaliation.  (Dkt. #1, Complaint).  The University now moves for

summary judgment.

## II.  STANDARD OF REVIEW

Summary judgment is proper where no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56 (c).  "Rule 56

(c) mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of

proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering such a motion, the court must review all of the evidence in the record.

See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (citing

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge . . . . The evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); accord Graham-Humphreys

v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 556-57 n.7 (6th Cir. 2000).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

"A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quoting FED. R. CIV. P. 56 (c)).  The movant meets this burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Clayton v. Meijer, Inc., 281 F.3d 605, 609 (6th Cir. 2002) (quoting Celotex, 477 U.S. at 324-25).  The non-movant then "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

"The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Anderson, 477 U.S. at 250).  "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250.

8

## III.  LAW AND ANALYSIS

Campbell has asserted claims of race discrimination, retaliation and racial harassment both under Title VII and 42 U.S.C. § 1981.  The University seeks summary judgment on all of Plaintiff's claims, arguing that Campbell has failed to raise any issues of material fact respecting any of his alleged claims.

Title VII prohibits discrimination by an employer against any individual on the basis of race, color, religion, sex, or national origin.  See 42 U.S.C. § 2000e-2(a).  42 U.S.C. § 1981 prohibits racial discrimination in the making and enforcing of private contracts.  See 42 U.S.C. § 1981.  "'The elements of [a] prima facie case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981.'"  Noble v. Brinker Intern, Inc., 391 F.3d 715, 720 (6th Cir. 2004) (quoting Johnson v. Univ. of Cincinnati, 215 F.3d 561, 573 n. 5 (6th Cir.2000) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993))).  Accordingly, the Court shall analyze Campbell's Section 1981 and Title VII claims of discrimination, retaliation and harassment under the legal framework established for Title VII claims.  See Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 n. 2 (6th Cir.2000); Morris v. Oldham County Fiscal Court, 201 F.3d 784, 794 (6th Cir. 2000).

## A.  Race Discrimination

A plaintiff may establish a prima facie case of employment discrimination with direct or indirect evidence.  See Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir.2003); Talley v. Bravo Pitino Restaurant, 61 F.3d 1241, 1246 (6th Cir.1995).  A "direct evidence" discrimination case requires proof "which, if believed, requires the

9

conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir.1999). "Consistent with this definition, direct evidence of discrimination does not require a fact-finder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir.2003).

Indirect or circumstantial evidence of discrimination, on the other hand, permits the inference that the employer acted with discriminatory animus. Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir.1997). When a plaintiff alleges indirect evidence of discrimination, a court must evaluate the claim under the tripartite framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, (1981). See Braithwaite v. Timken Co., 258 F.3d 488, 493 (6th Cir.2001). Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of discrimination or retaliation by showing that: (1) he is a member of a protected class; (2) he was qualified for the position in question; (3) despite his qualifications and employment, he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated non-protected employees. See id.; Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir.1992).

Once the plaintiff establishes a prima facie case, the burden of production shifts to the employer who must establish a legitimate, non-discriminatory reason for the adverse employment action in issue. See Braithwaite, 258 F.3d at 493. To do this, the employer

10

must "'clearly set forth…the reasons for the plaintiff's rejection' and that explanation 'must be legally sufficient to justify a judgment for the defendant.'" Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 666 (6th Cir. 2000) (quoting Burdine, 450 U.S. at 255).

Once the employer produces evidence of a non-discriminatory reason, the plaintiff has the burden to show that the proffered reason was pretextual and intended to obscure the true discriminatory motivations of the employer.  See Braithwaite, 258 F.3d at 493.  To show pretext a  "plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir.1994).  "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct or (3) was insufficient to warrant the challenged conduct." Dews, 231 F.3d at 1021; accord Manzer, 20 F.3d at 1084.

The University argues that Campbell fails to establish the fourth element of his prima facie case: that the University treated Campbell less favorably than similarly situated white employees.  "The fourth element…may be satisfied by showing that similarly situated non-protected employees were treated more favorably." Singfield v. Akron Metropolitan Houstin Auth., 398 F.3d 555, 562 (6th Cir. 2004) (citing Mitchell, 964 F.2d at 582–83).  "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employee's, the plaintiff must show that the 'comparables' are similarly situated in all respects." Id. (citing Mitchell, 964 F.2d at 583).  "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in

11

order for the two to be considered similarly-situated; rather…the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." Ercegovich v. Goodyear Tire and Rubber Co., 154 F.3d 344, 352 (6th Cir.1998). "In applying [this] standard courts should not demand exact correlation, but should instead seek relevant similarity." Perry v. McGinnis, 209 F.3d 597, 601 (6th Cir.2000).

Campbell claims disparate treatment with respect to the following adverse employment actions: (1) a verbal warning received for insubordination in August 2003; (2) verbal and written warnings for abusing lunch breaks; (3) a 10-day suspension received for falsifying records; (4) a verbal warning received regarding lock-out/tag-out procedures; and (5) non-promotion to supervisor positions. The Court, therefore, shall address whether Campbell can establish a claim of race discrimination with respect to each adverse action.

### 1. August 2003 verbal warning

In August 2003, Kraus, Campbell's supervisor issued Campbell a written warning for insubordination. Campbell fails to address whether similarly situated white employees have been treated more favorably during similar "verbal warning" incidents. In order to establish he suffered less favorable treatment, Campbell must demonstrate that a "comparable" employee is similarly situated to him "in all respects." Singfield, 398 F.3d at 562, (6th Cir. 2004). Here, Campbell fails to identify a "comparable" employee. Accordingly, Campbell has failed to demonstrate a prima facie case of race discrimination regarding the verbal warning received in August 2003. Even if Campbell could

12

demonstrate a prima facie case, the University has articulated a non-discriminatory reason for disciplining Campbell and provides evidence that Campbell acted insubordinate.  See Burdine, 450 U.S. at 255.  The University also provides evidence that a white employee in 2004 received the same discipline—a verbal warning—as a result of engaging in insubordinate behavior toward his supervisor.  Campbell fails to rebut the University's proffered non-discriminatory reason as pretextual.  Braithwaite, 258 F.3d at 493.  The Court, therefore, concludes that Campbell fails to establish a claim of race discrimination respecting the verbal warning he received in August 2003.

### 2.  Lunch breaks

In Fall 2003 Campbell was disciplined with a verbal warning for exceeding his scheduled lunch period.  In November 2004 Campbell was again disciplined for exceeding a lunch break, this time with a written warning.  Campbell argues that white PFOC employees regularly take long lunch breaks and do not receive discipline for such rule infractions.  In support of this argument, Campbell advances the testimony of his supervisor Kraus, a white male, who admits to abusing his lunch breaks when he was a technician.  Campbell also presents the affidavits of his white co-workers Stewart and Myers who both attest to regularly exceeding their lunch breaks without receiving discipline.  Campbell, however fails to assert or provide evidence demonstrating in what  "relevant aspects" Kraus, Stewart and Myers are similarly situated to himself. See Ercegovich, 154 F.3d at 352. Campbell "need not demonstrate an exact correlation" with Kraus, Stewart and Myers, but must at the very least assert *how* his situation is comparable to theirs.  See id.

13

Campbell does, however, provide evidence of a "similarly situated" non-protected employee in Howard.  Howard is a white PFOC employee, who in November 2004 was exceeded his thirty minute lunch break together with Campbell.  The PFOC discovered Campbell and Howard's violation and disciplined both of them.  Campbell and Howard, therefore, are "similarly situated" because each posses the "relevant similarities" of being PFOC employees who concurrently committed the same violation.  See Perry, 209 F.3d at 601.  Campbell cannot, however, demonstrate that the University treated Howard more favorably than he, even though they received disparate treatment—Howard received a verbal warning and Campbell received a written warning.  The Court finds that Howard's verbal warning fails to evidence less favorable treatment toward Campbell because Campbell, unlike Howard, already had a previous verbal warning.

The Court, therefore, finds that Campbell has failed to demonstrate he was treated less favorably than similarly situated white PFOC employees, and that Campbell, consequently has failed to also demonstrate a prima facie case of race discrimination respecting his discipline for abusing lunch breaks.

Assuming *arguendo*, Campbell could demonstrate a prima facie case of discrimination, the University has nonetheless articulated a non-discriminatory reason for disciplining Campbell and provides evidence of Campbell's abuse of lunch breaks.  See Burdine, 450 U.S. at 255.  The University also provides evidence that other, white employees have been disciplined for exceeding lunch breaks.  See id.  Campbell attempts to rebut the University's proffered non-discriminatory reason as pretextual, see Braithwaite,

14

258 F.3d at 493, by arguing that the discipline he received was unwarranted, see Dews, 231 F.3d at 1021, because the length of lunch breaks is a generally unenforced rule. As support, Campbell relies on the statements from Kraus, Stewart, and Myers that they abused lunch breaks without being disciplined. This evidence, however, fails to demonstrate a pretext because Kraus, Stewart and Myers, in stating that they were never disciplined for abusing lunch breaks fail to also state that the PFOC actually knew about their misconduct. See Braithwaite, 258 F.3d at 493 ("plaintiff must…put forth evidence which demonstrates that the employer did not "honestly believe" in the proffered non-discriminatory reason for its adverse employment action ."). See id. The Court, therefore, concludes that Campbell fails to establish a race discrimination claim respecting the verbal warning and written warnings he received for abusing lunch breaks.

### 3. 10-day suspension

In February 2005 the PFOC disciplined Campbell with a 10-day suspension for failing to accurately report his whereabouts during a lunch break by falsifying a time card. Campbell fails to address whether similarly situated white employees have been treated more favorably during similar record falsification incidents. In order to establish less favorable treatment, Campbell must demonstrate that a "comparable" minority-employee is similarly situated to himself "in all respects." Singfield, 398 F.3d at 562, (6th Cir. 2004). Here, Campbell fails to identify a "comparable" employee.[2] Accordingly, Campbell fails

---

[2]Indeed, Campbell utterly fails to address the subject of record falsification and attempts to couch the 10-day suspension as discipline for exceeding lunch breaks. The

to demonstrate a prima facie case of race discrimination respecting the 10-day suspension.

Assuming *arguendo*, that Campbell could establish a prima facie case of discrimination, the University nonetheless has articulated a non-discriminatory reason for disciplining Campbell and provides evidence of Campbell's acts constituting the falsification of records.  See Burdine, 450 U.S. at 255.  The University also provides evidence that the PFOC has suspended and recommended termination for white employees who falsified records.  Campbell attempts to argue that the University's non-discriminatory reason is pretextual by challenging the factual basis behind the University's decision.  See Dews, 231 F.3d at 1021.  Campbell, alleges that the videotape evidence forming the basis of the University's decision to suspend Campbell was altered.  Other than his speculations as to how the videotape could have been altered, Campbell presents no evidence to support such a bald assertion.  See Burdine, 450 U.S. at 255 n.9 ("An articulation not admitted into evidence will not suffice.  Thus the defendant cannot meet its burden merely…by argument of counsel.").  The Court, therefore, concludes that Campbell fails to establish a race discrimination claim respecting his 10-day suspension..

### 4.  Lock-out/Tag-out procedures

In December 2004, Campbell received a verbal warning for violation of the University's lock-out/tag-out safety rule.  Campbell argues that white PFOC employees do not receive discipline for violating the lock-out/tag-out rule.  In support of this argument,

_____

record, however, clearly reflects that the PFOC imposed the 10-day suspension due to Campbell's falsification of records.  See (Viau Aff.at 10).

16

Campbell advances the testimony of his white co-workers Stewart and Myers who each attest that no one, besides Campbell has received discipline for violating the lock-out/tag-out rule.  Stewart further admits that he has used lock-out/tag-out locks in the same manner as Campbell did and has not been disciplined.  Campbell, in advancing this evidence, again fails to provide evidence demonstrating in what "relevant aspects" these non-minority employees are similarly situated to himself.  See Ercegovich, 154 F.3d at 352.  As stated *supra*, Campbell "need not demonstrate an exact correlation" with Stewart and Myers, but must at the very least assert *how* his situation is comparable to theirs.  Id.  In this instance, Campbell fails to show whether Stewart and Myers were ever caught and not disciplined, and, more importantly, Campbell fails to show exactly when Stewart and Myers engaged in conduct contrary to the lock-out/tag-out policy.  Campbell's verbal warning occurred in December 2004, after the introduction on December 1st of a new, revised, and stricter lock-out/tag-out policy.  Stewart and Myers' affidavits fail to note if their claimed unpunished misconduct occurred before or after the introduction of the new lock-out/tag-out policy.

The Court, therefore, finds that Campbell has failed to demonstrate that he was treated less favorably than similarly situated white PFOC employees, and that Campbell, consequently has failed to also demonstrate a prima facie case of race discrimination respecting his discipline for violating the lock-out/tag-out policy.

Assuming *arguendo*, Campbell could demonstrate a prima facie case of discrimination, the University has articulated a legitimate, non-discriminatory reason for the verbal warning and provides evidence of Campbell's violation of the lock-out/tag-out

rule. See Burdine, 450 U.S. at 255. The University also provides evidence that a white PFOC employee was also given, in 2004, a verbal warning for violation of the lock-out/tag-out rule.[3] Campbell attempts to rebut the University's proffered non-discriminatory reason as pretextual, see Braithwaite, 258 F.3d at 493, by arguing that the discipline he received was unwarranted, see Dews, 231 F.3d at 1021, because the lock-out/tag-out policy is a generally unenforced rule. As support, Campbell relies on the statement from Stewart, that he abused the policy without being disciplined. This evidence, however, fails to demonstrate a pretext because it does not demonstrate that the PFOC knew of misconduct and ignored it—that the PFOC did not "honestly believe" in its proffered reason for disciplining Campbell. See Braithwaite, 258 F.3d at 493. The Court, therefore, concludes that Campbell fails to establish a race discrimination claim respecting his discipline for violating the lock-out/tag-out policy.

### 5. Non-promotion

Campbell, in making his claim for discrimination regarding his non-promotion to supervisor positions, first asserts direct evidence of race discrimination. Direct evidence, as discussed *supra* is evidence "which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Jacklyn, 176 F.3d at 926. Campbell presents the affidavit of his co-worker James Carstarphen, an

---

[3]The Court does note, however, that this evidence also fails to specify when in 2004 the PFOC disciplined the white employee—if it was before or after the change in the lock-out/tag-out policy.

African-American employee of the PFOC working in the Electric Shop. Carstarphen attests that his supervisor, Marc Coontz ("Coontz"), told him the reason Campbell had been denied advancement in the PFOC was that "as long as Gregor and that outfit are in charge there would be no brown skinned supervisors." (Carstarphen Aff. at 3). Campbell argues that this statement is direct evidence because: Coontz is a supervisor who plays a role in determining who is promoted; Coontz acted in the scope of his employment when he responded to Carstarphen's question; and Coontz made this statement at about the same time as Campbell's non-promotions and discipline.

The Court disagrees. First, the record contradicts Coontz's statement. In 2002, during the Gregor's tenure, an African-American was promoted to the position of Superintendent. (Dkt. #17, Ex. E, Affidavit of Joseph Gregor ("Gregor Aff.") ¶ 4). Second, and more significantly, Coontz's statement is a remark made by a non-decision-maker and is not probative of disparate treatment. Phelps v. Yale Sec., Inc., 986 F.2d 1020, 1025 (6th Cir. 1992). Coontz, although a supervisor, was not Campbell's supervisor. The record fails to reveal that Coontz participated in any of the decisions to not promote Campbell or in any decisions to discipline Campbell. Carstarphen's Affidavit also fails to specify when Coontz made this statement and to which non-promotions the statement applies. Coontz's statement, thus, fails to demonstrate evidence that a decision-maker made "statements evinc[ing] a discriminatory intent" at "the very time" of an adverse action. Wexler, 317 F.3d at 572. The Court determines, therefore, that Coontz's statement is not direct evidence of the University's discriminatory intent in not promoting Campbell.

19

Campbell, therefore must rely on indirect evidence to prove his claim of discrimination regarding the University's failure to promote him. In order to establish a prima facie case in the context of a claim for failure to promote, using the McDonnell Douglas framework, a Plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied for and was qualified for the position; (3) he was considered for and was denied the position; and (4) the position remained open or was given to a less qualified applicant who was not a member of the protected class. See Roh v. Lakeshore Estates, Inc., 241 F.3d 491, 497 (6th Cir.2001); Faison v. Mahoning County Sheriff's Dept., 139 Fed. Appx. 708, 712 (6th Cir. 2005).

Campbell has alleged several instances in which the University failed to promote him. Campbell, in each instance, meets the first three elements of his prima facie case. Campbell, however, in almost each instance, fails to establish the fourth element of his prima facie case—he fails to demonstrate that the applicants who received promotions instead of him were less qualified.

### a. August 2002: no promotion to Superintendent of HVAC Shop

In August 2002, Gregor, Director of the PFOC, appointed Kraus, a white male, as Superintendent of the HVAC Shop. Campbell alleges that he was more qualified than Kraus for that position.[4] In support, Campbell presents the affidavit of Stewart, a co-worker

---

[4]Regarding the other elements of Campbell's prima facie case, Campbell admits that he did not apply for, nor was he considered for the Superintendent of the HVAC Shop position. In demonstrating the prima facie elements of a Title VII failure to promote case, however, "a plaintiff does not have to establish that he applied for and was considered for

and supervisor who attests to having personal knowledge that Campbell is more qualified to be a supervisor than Kraus.  Stewart bases this knowledge on his subjective observation of Kraus in July 2002 when Kraus was unable to properly install a rooftop compressor.  (Stewart Aff. ¶ 13–14).  Campbell also personally attests he is more qualified than Kraus.  (Campbell Dep. at 26, 100–02).  These are, however, subjective observations.  "At the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job."  Wexler, 317 F.3d at 575 (citing Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1298 (D.C.Cir.1998); MacDonald v. E. Wyo. Mental Health Ctr., 941 F.2d 1115, 1121 (10th Cir.1991)).  Objective qualifications include a plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.  Wexler, 317 F.3d. at 576.  Campbell fails to assert any objective qualifications he possessed that made him more qualified for the position of Superintendent for the HVAC Shop than Kraus.  Accordingly, Campbell fails to demonstrate a prima facie case of race discrimination regarding his non-promotion to the Superintendent for the HVAC Shop position.

Assuming *arguendo*, that Campbell could establish a prima facie case of

─────────────────────

the promotion when the employer does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion."  Dews v. A.B. Dick Co., 231 F.3d 1016, 1022 (6th Cir. 2002).  Gregor did not post the Superintendent for the HVAC Shop position.  Accordingly, Campbell can establish the first three elements of his prima facie case regarding the Superintendent for the HVAC Shop position.

21

discrimination, the University nonetheless has articulated a non-discriminatory reason for not promoting Campbell and presents evidence that Kraus was more qualified than Campbell. See Burdine, 450 U.S. at 255. The record reveals that Gregor based his decision to place Kraus in the position on the fact that Kraus was already a Superintendent. (Gregor Dep. at 14–20). Gregor stated that, in considering candidates for the Superintendent of the HVAC Shop position, he considered Kraus as well as Rob Fraley because they were two of the newest Superintendents Gregor had just hired. (Gregor Dep. at 18). Within the PFOC there are several Superintendents operating in various divisions, HVAC being one of them. (Kraus Dep. at 4). Accordingly, these men had "qualifications in the Superintendent classification." (Gregor Dep. at 20). Kraus's new position, therefore, was not a promotion but a lateral move from one Superintendent position to another. (Gregor Dep. at 20). Campbell does not assert that he held "qualifications in the Superintendent classification" and the record fails to reveal that Campbell was a Superintendent in August 2002. The Court, therefore, concludes that Campbell fails to establish a race discrimination claim respecting his non-promotion to the Superintendent for the HVAC Shop position.

### b. May 2004: no promotion to Manager of Maintenance

In May 2004 Campbell applied for the position of Manager of Maintenance for the Department of Student Recreation and Wellness Services ("Student Services"). Campbell did not receive the position; instead Richard Grizer, a white male, was selected for the position. Campbell utterly fails to present evidence demonstrating how he was more qualified than Richard Grizer for the position. As part of a prima facie case for race

discrimination in the context of a failure to promote, a plaintiff *must* present evidence that the position in question remained open or was given to a less qualified non-minority.  See Roh, 241 F.3d at 497.  Campbell fails to do this.  Accordingly, Campbell fails to establish a prima facie case of race discrimination respecting his non-promotion to the Manager of Maintenance position.

Assuming *arguendo*, that Campbell could establish a prima facie case of discrimination, the University has articulated a legitimate, non-discriminatory reason for not selecting Campbell and provides evidence that Grizer was more qualified.  See Burdine, 450 U.S. at 255.  Grizer had broader experience with buildings trades issues and broader experience with pool operations as compared to Campbell.  (Knusman Aff. ¶ 6).  Campbell was less qualified for the position because he was not a Certified Pool Operator.  Indeed, Campbell took the course to become a Certified Pool Operator but failed it.  Campbell fails to rebut the University's proffered non-discriminatory reason as pretextual.  Braithwaite, 258 F.3d at 493. The Court, therefore, concludes that Campbell fails to establish a race discrimination claim respecting his non-promotion to the Manager of Maintenance position.

### c. December 2004: no promotion to Zone Superintendent

In December 2004 Campbell applied for the position of Zone Superintendent in the PFOC.  The selection committee evaluated Campbell as the sixth most qualified applicant and he did not receive the position; instead the committee selected James Miller, a white male, as the most qualified applicant for the position.  Campbell utterly fails to present evidence regarding the fourth prong of his prima facie case—evidence concerning how he

23

was more qualified than James Miller for the position.  See Roh, 241 F.3d at 497. Accordingly, Campbell fails to establish a prima facie case of discrimination respecting his non-promotion to Zone Superintendent.

Assuming *arguendo*, that Campbell can establish a prima facie case of discrimination, the University has articulated a non-discriminatory reason for not promoting Campbell and presents as evidence, the selection committee's written evaluation comparing Campbell's and James Miller's qualifications.  See Burdine, 450 U.S. at 255.  Campbell fails to rebut the University's proffered non-discriminatory reason as pretextual. Braithwaite, 258 F.3d at 493.  The Court, therefore, concludes that Campbell fails to establish a race discrimination claim respecting his non-promotion to Zone Superintendent in December 2004.

### d. 2005: no promotion to Zone Superintendent

In April 2005 Campbell again interviewed for the position of Zone Superintendent in the PFOC.  The position remains open.  Campbell, therefore, finally has established a prima face of discrimination: he is in a protected class; he applied for and was qualified for the position; he was considered for and denied the position; and the position remains open. See Roh, 241 F.3d at 497.  Campbell having met his prima facie burden, the burden now shifts to the University, who must articulate a non-discriminatory reason for not promoting Campbell.  See Braithwaite, 258 F.3d at 493.  The University asserts as a legitimate, non-discriminatory reason: that Campbell was not the most qualified applicant.  In support, the University offers as evidence the selection committee's memorandum describing how John

24

Gromofsky was the most qualified applicant and how Campbell was the third most qualified applicant.  (Dkt. #17, Ex. B-2).  The Court finds that this evidence is "legally sufficient to justify a judgment for [the University]."  See Burdine, 450 U.S. at 255.

The burden now shifts to Campbell, who must prove that the University's proffered reason is pretextual.  See Braithwaite, 258 F.3d at 493.  Campbell may do this by showing that the University's articulated reason (1) has no basis in fact; (2) does not actually motivate the University's actions; or (3) is insufficient to warrant the University's actions. See Dews, 231 F.3d at 1021.  Campbell fails to do this.  Instead he asserts that the fact that the position is left unfilled, rather than fill it with an African-American "more than raises the specter of pretext."  (Dkt. #22 at 16).  Campbell fails to elaborate on this argument or present evidence supporting the argument.  Campbell may not merely assert an argument "raising the specter of pretext," he must also present evidence supporting such an argument. See Dews, 231 F.3d at 1021.  This, he fails to do.

The Court, therefore, concludes that Campbell fails to present evidence rebutting the University's non-discriminatory reason for not promoting Campbell.  Consequently, Campbell fails to establish a claim of race discrimination respecting his non-promotion to Zone Superintendent in 2005.

## B. Retaliation

Campbell also alleges claims of unlawful retaliation pursuant to Title VII and § 1981.  To make out a prima facie case of retaliation under Title VII and § 1981, a plaintiff must prove: (1) that he engaged in activity protected by Title VII; (2) this exercise of

protected rights was known to the defendant; (3) defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.  See Ford v. GMC, 305 F.3d 545, 552–53 (6th Cir. 2002); Singfield, 389 F.3d at 563; Harrison v. Metro Gov't, 80 F.3d 1107, 1118 (6th Cir. 1996).  Once the plaintiff has established this prima facie case, the burden of production of evidence shifts to the employer to articulate some legitimate, non-retaliatory reason for the adverse employment action.  Ford, 305 F.3d at 553.  If the defendant carries this burden, the plaintiff must then produce "sufficient evidence to allow a jury to reasonably reject [the employer's] explanation" as a pretext for discrimination.  Burdine, 450 U.S. at 254–56.  Despite the shifting burdens of production, the burden of persuasion remains at all times with the plaintiff.  Id.

Campbell first alleges direct evidence of retaliation derived from Carstarphen's Affidavit.  Carstarphen attests that his supervisor, Coontz, warned him "to watch out when [Campbell] was with [Carstarphen] because [Campbell] was being watched." (Carstarphen Aff. at 2).  Coontz also told Carstaphen that "'they', meaning Joe Gregor, Sandra Smith, and Rob[ert] Kraus, were targeting or watching [Campbell] because of [his] prior lawsuit and for voicing his opinions about his treatment." (Carstarphen Aff. at 2).  As discussed supra, Coontz is not a decision-maker involved in making the adverse actions affecting Campbell.  See Wexler, 317 F.3d at 572.  This conclusory statement, therefore, cannot be considered as direct evidence of retaliation.

Campbell, consequently must establish his retaliation claim through indirect

26

evidence and the burden-shifting framework discussed above.  See Ford, 305 F.3d at 552–53.  The University concedes that Campbell can establish the first three elements of his retaliation claim: that he engaged in an activity protected by Title VII—his previous lawsuit for employment discrimination and complaints to the EEOC of continued discrimination; that it knew of the lawsuit and complaints; and that it took adverse employment actions against him in the form of discipline and non-promotion to supervisor positions.  The University contends that Campbell cannot establish the fourth element of his prima facie retaliation case: that a causal connection exists between Campbell's protected activity and the adverse employment actions.

To establish the causal connection required in the fourth element, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not engaged in a protected activity.  See Singfield, 389 F.3d at 563; EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir.1997); Jackson v. RKO Bottlers, 743 F.2d 370, 377 (6th Cir.1984).  "Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation."  Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir.2000).  The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met.  See Avery, 104 F.3d at 861.

Campbell fails to demonstrate or even make an argument that any sort of "close

27

temporal proximity" existed between his lawsuit or complaints to the EEOC and any adverse employment actions.  See  Nguyen, 229 F.3d at 563.  Indeed, the only date referenced by Campbell in his responsive brief is "early 2000," when Gregor became aware of Campbell's previous lawsuit.  Campbell fails to identify the dates of his other protected activities—such as when he made complaints to the EEOC and how soon thereafter he suffered an adverse action.  See id.  Such arguments and corresponding evidence may be buried within Campbell's submitted exhibits; however, it is not the role of the Court to develop facts for a non-moving party who has failed to respond to a portion of moving party's summary judgment argument.  See Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992).

Rather than argue a temporal proximity between his protected activity and an adverse employment action, as a method of proving the causation element, Campbell relies on the same arguments and evidence advanced as part of his race discrimination claim: that the University treated similarly situated PFOC employees differently than it treated Campbell.  See Nguyen, 229 F.3d at 563.  The Court, therefore, has already addressed these arguments in the context of Campbell's race discrimination claims and determined that in each instance of discipline Campbell failed to identify a similarly situated non-minority employee who received more favorable treatment than Campbell.

The only evidence Campbell provides relating to the causation element of his prima facie case of retaliation, are these assertions that other PFOC employees were treated differently than he.  The Court, as discussed in detail *supra*, found that Campbell failed to

28

present sufficient evidence to demonstrate that he was similarly situated with the identified employees.  Other than his claim of disparate treatment as compared to other employees, Campbell presents no further evidence relating to the establishment of a causal connection for his prima facie retaliation claim.  The Court, thus, finds that Campbell has failed to produce sufficient evidence from which an inference could be drawn that his verbal warnings, written warning and 10-day suspension would not have occurred had Campbell not engaged in the protected activity of filing his previous lawsuit.  See Avery, 104 F.3d at 861.  The Court, accordingly, determines that Campbell fails to establish the causal connection element of his prima facie retaliation case.  Consequently, Campbell fails to establish a claim for retaliation.

## C.  Racial Harassment

Lastly, counts 2 and 5 of Campbell's Complaint allege a claim of racial harassment.  (Dkt. #1).  Campbell's Response to the University's motion for summary judgment, however, fails to address this claim.  (Dkt. #22).

> Where no response to a summary judgment motion is properly before a district court, the court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." Street [v. J.C. Bradley & Co.], 886 F.2d [1472], 1479–80 [(6th Cir. 1989)].  Rather, the district court may rely upon the facts advanced by the movant. Id. Federal Rule of Civil Procedure 56(e) requires that the nonmoving party's response designate specific facts demonstrating the existence of genuine issues of material fact. Fed.R.Civ.P. 56(e).  The nonmoving party is deemed to have waived its opportunity to designate facts in accordance with Rule 56(e) when it fails to properly file a response. Guarino, 980 F.2d at 405.  [The Sixth Circuit] has stated that it is not the role of the district court to develop facts for the nonmoving party.  Id. at 406.

 Spurlock v. Whitley, 79 Fed. Appx. 837, 2003 WL 223764617, *2 (6th Cir. Oct. 29, 2003). Campbell has failed to respond to the University's arguments that no issue of fact exists regarding a Campbell's claim of racial harassment.  Accordingly, the Court shall only evaluate the sufficiency of the University's argument and designated supporting facts regarding the racial harassment claim.  See Guarino, 980 F.2d at 406.

In order to establish a prima facie case of hostile work environment based on race, a plaintiff must establish the following five elements: (1) he was a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; (5) the existence of employer liability.  See Risinger v. Ohio Bureau of Workers' Compensation, 883 F.2d 475, 484 (6th Cir.1990).

Of these elements, Campbell can only prove the first, that he is a member of a protected class.  Campbell has claimed the following instances of racial harassment: that he is often forced to work alone; and that he gets less favorable, "dirty" jobs.  He can, however, proffer no evidence that these circumstances exist or that they were motivated by his race.  Depending on the job, Campbell as well as other employees are required to work alone or in groups.  (Kraus Aff. ¶ 15).  Campbell admits that other PFOC employees often perform jobs by themselves and that as a Certified Master Technician, he should be able to handle anything on his own.  (Campbell Dep. at 130–32).  Furthermore, there is no evidence that these issues unreasonably interfered with Campbell's work performance.

For these reasons, Campbell cannot establish a claim of racial harassment.

## IV.  CONCLUSION

For the foregoing reasons, the Defendant The University of Akron's Motion for Summary Judgment (Dkt. #17) is **GRANTED**.  Defendant is granted summary judgment on counts alleged the Complaint.  Therefore, the Defendant is entitled to judgment on all counts.

**IT IS SO ORDERED.**

 */s/ Peter C. Economus* – **10/26/05**
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**

31